UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

| | |
|---|---|
| BRANDON J. BATTLES,<br>    Debtor.<br>_____/ | Case No. 16-31482-dof<br>Chapter 7 Proceeding<br>Hon. Daniel S. Opperman |
| JASON FULCHER,<br>    Plaintiff, | |
| v. | Adversary Proceeding<br>Case No. 16-3112-dof |
| BRANDON J. BATTLES,<br>    Defendant.<br>_____/ | |

TRIAL OPINION

Introduction

The Plaintiff, Jason Fulcher, requests that this Court determine that a debt arising from a judgment in favor of him and against the Defendant, Brandon Battles, in the amount of $220,000 be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). The Genesee County Circuit Court entered this judgment because Mr. Battles struck Mr. Fulcher on April 22, 2012, knocking Mr. Fulcher unconscious, breaking his jaw and causing other serious injuries. Because the Court finds that this debt is from a willful and malicious injury, the Court concludes that the debt of Mr. Battles to Mr. Fulcher is excepted from discharge.

The Court held a Trial in this matter on March 26, 2018 and heard testimony of Mr. Fulcher, Greg Murray, and Lonnie Whitman who were called by the Plaintiff and Mr. Battles who testified on his own behalf. The Court also admitted the deposition transcript of Ryan Brittain at the request of the Defendant because Mr. Brittain was unavailable to testify on March 26, 2018. After hearing

1

the testimony of these witnesses and examining Exhibits 1 and 2 admitted at Trial, the Court makes the following findings of fact.

Findings of Fact

Mr. Fulcher is a disc jockey and has played pre-recorded music at various places throughout the greater Flint area for 28 years. One of these places is a bar known as New Jester's Bar ("Jester's") where Mr. Fulcher was performing on April 21 and 22, 2012. Mr. Fulcher was very busy at Jester's that night performing a 9:00 p.m. to 2:00 a.m. shift and business was very brisk. After closing down his act, Mr. Fulcher was relaxing in the smoking room when he heard noise outside in the parking lot. He recalls walking out of the smoking room and into the parking lot and then raising his arms with open palms while asking the crowd in the parking lot to calm down and disperse. As Mr. Fulcher turned, he was hit by Mr. Battles. Mr. Fulcher then dropped to the ground and was unconscious for a few minutes before he was revived. Mr. Battles' punch was so strong that Mr. Fulcher was taken to the hospital and hospitalized for approximately one week.

Mr. Whitman and Mr. Murray generally collaborate Mr. Fulcher's version of the facts. Mr. Whitman is an individual in charge of security for the parking lot of Jester's with a primary focus of avoiding theft, vandalism of vehicles, and deterring drug usage and transactions. Per Mr. Whitman, Mr. Fulcher walked into the parking lot area at a normal gait and was punched by Mr. Battles. Mr. Whitman did not see that Mr. Battles was in any imminent danger and did not see Mr. Fulcher take any belligerent action against Mr. Battles.

Mr. Whitman was not aware that there was a heated discussion between two groups in the parking lot and that Mr. Battles was a member of one of those groups. Mr. Murray, whose wife works at Jester's, had been at Jester's 3 to 4 hours that night. He had a slightly different perspective,

in that he saw the two groups arguing with each other with Mr. Battles taunting members of one group to come and fight him. In doing so, Mr. Battles assumed a stance. Mr. Fulcher then stepped into the parking lot with his arms up and palms open and Mr. Battles hit him.

Mr. Battles gives a slightly different view of the events of April 22, 2012. He was at Jester's to be part of his friend's birthday celebration and arrived there at approximately 1:45 a.m. He testified that he had one beer at Jester's and then left Jester's, but was accosted in the parking lot by a group of 3-5 patrons verbally abusing him and then punching him. After separating himself from this group and after 30 seconds, he started backing away from this group, heard Mr. Fulcher, turned and punched Mr. Fulcher in the face, dropping him to the ground. Thereafter, the bouncers of Jester's detained Mr. Battles until the Genesee Township Police arrived. While Mr. Fulcher was being taken to the hospital, the Genesee Township Police cited Mr. Battles for assault and battery.

At Trial, Mr. Battles gave conflicting views as to exactly what happened on April 22, 2012. At one time, he testified that he was engaged in a heated discussion with 3-5 people who were trying to surround him and that he was physically attacked by a couple of people in this group. He placed Mr. Fulcher behind him at that time and indicated that Mr. Fulcher touched his shoulder, prompting him to swing and punch Mr. Fulcher. Later, however, Mr. Battles testified that Mr. Fulcher approached him from the front, touched or bumped his chest, and then Mr. Battles hit Mr. Fulcher.

Although he was not available, the Court admitted the deposition testimony of Ryan Brittain. Pertinent parts of that testimony include:

Q: But the night of the incident we're talking about is the night at Jesters where there was an altercation?

A: Yes.

Q: And you were there?

A: Yes, I was.

Q: Had you been there all day?

A: No.

Q: What time did you get there?

A: I got there probably about 8 - - 8:00 I want to say. I'm not 100 percent sure because it's been a while.

Q: Yeah, I understand. What time did you leave?

A: I was only there for about a - - Man, about 11 maybe.

Q: You walked out at 11:00?

A: Yeah. I'm not 100 percent positive.

Q: Okay. What - - In your own words, explain what happened that night.

A: That's - - I called Brandon to come up and have a drink with me.

. . .

A: He was just coming home. He was working over the road or driving a truck or somewhere. He met me up there. He come in. We had a beer. Well, he had a beer. I - - We shot a game of pool. Well, he didn't.

. . .

A: . . . We were coming out, and there was a fight going on - -

Q: Did you know the - -

A: - - already.

Q: Sorry. Did you know the people that were fighting?

A: I knew one guy.

Q: And what was his name?

A: His name was Ryan, but I'm not sure of his last name.

. . .

Q: All right. Who came after Brandon?

A: That Ryan guy did.

. . .

A: And me and Brandon were walking to our cars, and Brandon was - - we was watching. They're like what the F are you looking at.

Q: Yeah.

A: And then I was like a couple of steps ahead of Brandon, and then like two bouncers from Jesters and that guy Ryan came at Brandon.

Q: Okay.

A: And then he yelled for me. He said Ryan, you know. So I come over. I got it broken up, and I'm like - - No one swung, no one hit. It was just words exchanged.

. . .

A: . . . As we were walking away, we - - they turned, we turned, and some guy come running out. A short guy come running after Brandon, like had his hands up, and as he like approached Brandon, he got really close and like chest bumped like his chest hit him.

Q: Do you know who this person was?

A: No, not at the time. No.

. . .

A: And then after the guy - - Brandon backed up, and I - - I said what are you doing, and - - to the guy, and he kept coming after Brandon like just kept coming like in his face and like chest bumping him like antagonizing him, and then Brandon punched him.

. . .

Q: Okay. What did the DJ do at that time?

A: Nothing. He - - I'm not sure because after we got out of there, they chased us. We kind of ran into the back parking lot trying to get out of there, and I'm not sure what - - where he went.

Q: So when - - when he came out and got into Brandon's face, he immediately started chest bumping him?

A: Yes.

. . .

Q: . . . Right before Brandon punched him, what did that person do that got punched? He was just holding his hands up in his face?

A: No, he was like - - kind of like - - It looked like he wanted to fight Brandon.

. . .

A: Like he - - He didn't necessarily have a - - like a - - like he was going to - - like a stance like he was boxing him, but you could tell from his hand motion like when he was like yelling and pushing like - - like coming after Brandon, he was in his face and chest bumping and screaming in his face.

(Plaintiff's Exhibit 2, Pages 4-12)

Mr. Battles posted the following on his Facebook page at 12:03 p.m. on April 22, 2012, less than 12 hours after he hit Mr. Fulcher:

"Wondering what happen to the dj I punched and put in the hospital ... One hitter quitter! What can say haha lol."

Mr. Battles' next public statement regarding the altercation occurred at his arraignment in the 67th District Court for Genesee County on May 14, 2012.

BEFORE THE HONORABLE LARRY J. STECCO, DISTRICT JUDGE

Flint, Michigan - Monday, May 14, 2012

THE COURT: Branden Jay Battles. Mr. Battles, you're charged with assault. It's a misdemeanor. It's punishable by up to 93 days in jail and or fine of up to $500, plus costs. Do you understand that, sir?

MR. BATTLES: Yes, sir.

THE COURT: How do you wish to plead?

MR. BATTLES: Guilty.

THE COURT: There is an advice of rights form in the file signed by you; you understand your rights, sir?

MR. BATTLES: Yes, sir.

THE COURT: You understand by pleading guilty you'll be waiving those

rights. You will not have a trial of any kind. You'll be giving up your right to be represented by an attorney. And, are you pleading guilty because in fact true that on April 22nd, 2012 at the Jester's Bar; Genesee Township; Genesee County; Michigan you struck a person by the name of Jason Fulcher? Did you strike somebody there?

    MR. BATTLES: Yeah. I did it.

    THE COURT: Very good. I'll find that the plea is voluntary and understandably given. There's a factual basis on the record for accepting the plea.

A few days later, on May 23, 2012, Mr. Battles again posted an interesting statement on Facebook:

"Can't wait for pay day, so I can get plates, insurance on the whip! Start this cage fighting 50 dallied a month..."

Thereafter, Mr. Fulcher sued Mr. Battles in the Genesee County Circuit Court and obtained a judgment against him in the amount of $220,000. Despite some attempts to pay a portion of this obligation, Mr. Battles concluded that he could not do so and filed a petition seeking relief under Chapter 7 of the Bankruptcy Code with this Court on June 22, 2016. In turn, Mr. Fulcher filed the instant adversary proceeding and obtained a default judgment, which Mr. Battles requested to have this Court set aside. This Court did so, but concluded that the sole issue to litigate was whether the actions of Mr. Battles were malicious and willful under Section 523(a)(6).

<u>Jurisdiction</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

<u>Relevant Law</u>

<u>Section 523(a)(6)</u>

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a

7

discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." The exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) (recognizing "the axiom that requires this court to construe exceptions to the bankruptcy discharge narrowly and in favor of the debtor.") (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)). A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6). The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6). *Id*. at 59. The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury. *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the

*consequences of an act," not simply "the act itself."*

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge "should be confined to those plainly expressed.'

*Id.* at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id.* at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit Court of Appeals by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id.* (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such:

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted).

Subsequently, the Sixth Circuit Court of Appeals re-visited this issue in the case of *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001). In that case, the Sixth Circuit Court of Appeals reiterating the holdings in *Geiger* and *Markowitz*, summarizing the test under Section 523(a)(6) as: "[O]nly acts done with the intent to cause injury–and not merely acts done intentionally–rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6).".

Analysis

The parties agree that the judgment by the Genesee County Circuit Court is binding upon them as to the underlying facts that support this judgment, as well as the plea made by Mr. Battles. Damages are also not in issue. Thus, the only issue that was litigated at trial and is before this Court for determination is whether the actions of Mr. Battles were willful and malicious.

At the May 14, 2012 arraignment, Mr. Battles clearly admits that he hit Mr. Fulcher and that statement was accepted as the factual basis for the plea of being guilty of assault. In Michigan, assault and battery is defined as the intentional, uncontested, harmful or offensive touching of

another person with the intent to injure. *Lakin v. Rund*, 318 Mich. App. 127 (2016). At his arraignment, Mr. Battles admitted striking Mr. Fulcher, which supported his plea of being guilty of assault. Parsing the situation closely, Mr. Battles did plead guilty to assault, but not necessarily battery. In doing so, Mr. Battles freely admits striking Mr. Fulcher.

Mr. Battles seeks to raise the affirmative defense of self-defense and argues that it is his mental state that controls here and that in this situation his debt to Mr. Fulcher is discharged. The terms of the Michigan Self-Defense Act therefore apply. In particular, self-defense may be found "if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual." Mich. Comp. Laws 780.972(2). The claim of self-defense is an affirmative defense, so Mr. Battles carries the burden of proof in establishing that these elements have been met. *Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004).

Here, this Court does not find the requisite elements of self-defense. First, while certain witnesses testified that they were aware that there were words and shoving going on between the two groups in question, no one other than Mr. Battles and perhaps Mr. Brittain place Mr. Fulcher in the middle of this altercation. Mr. Murray, a witness called by Mr. Fulcher, was in a position to see that there was some interaction between the two groups, but his testimony is that Mr. Battles was goading one group to fight him. Second, Mr. Battles testified that there was at least a 30 second delay between the last time that he had any exchange with the one group before he punched Mr. Fulcher. At various times, Mr. Battles places Mr. Fulcher either in front of him or behind him, but always in a position where Mr. Fulcher had his arms extended and palms open with no evidence that Mr. Fulcher intended to hit Mr. Battles. The best version for Mr. Battles is that Mr. Fulcher somehow approached him from behind and touched his shoulder, but no witness other than Mr.

Battles support this version. Three witnesses, two of which are disinterested, confirm that Mr. Fulcher did not touch Mr. Battles.

Third, Mr. Battles testified that he punched other individuals prior to hitting Mr. Fulcher and whatever force he used with those individuals did not apparently render any of these individuals unconscious. Accordingly, not only did Mr. Battles unnecessarily hit Mr. Fulcher, but hit him harder than needed so as to render him unconscious. With these facts, this Court does not find that there was any self-defense by Mr. Battles that was merited under these circumstances.

The testimony of Mr. Brittain partially supports Mr. Battles, but his testimony is inconsistent with all other witnesses and, in many cases, Mr. Battles. Mr. Brittain's deposition testimony paints Mr. Battles as an innocent bystander near an ongoing fight, which could form the basis of self-defense for Mr. Battles. But Mr. Brittain places Mr. Fulcher in front of Mr. Battles at all times and has Mr. Fulcher chest bumping Mr. Battles, in direct contradiction to the other witnesses and part of the trial testimony of Mr. Battles. Moreover, Mr. Brittain testified that Mr. Fulcher goaded Mr. Battles to fight him, and no witness confirms that understanding. The Court finds that Mr. Brittain's testimony is not credible, but included it in this Opinion to give a complete statement of the record and demonstrate that the Court considered and then rejected a majority of that evidence.

The Court construes the Facebook posts of Mr. Battles to conclude that Mr. Battles did not accidently hit Mr. Fulcher or, if he did so, expressed no regret, which evidences that Mr. Battles did indeed intend to hit Mr. Fulcher and cause the injuries that he caused. This is particularly true given that inferences must be drawn from circumstances in cases such as this. Also, there are no inferences that can be drawn from these facts that suggest, much less prove, otherwise.

The Court finds the testimony of Mr. Battles to be inconsistent and insufficient to prove self-defense. Instead, the Court finds that Mr. Battles intentionally hit Mr. Fulcher and in doing so

intended to injure Mr. Fulcher, all as defined by *Geiger* and *Markowitz*. The Court also finds that Mr. Battles committed a malicious injury by hitting Mr. Fulcher in conscious disregard to his duties or without just cause or excuse. The Court finds that Mr. Battles did not act in self-defense and that he was not in danger or in need to defend himself when he hit Mr. Fulcher.

Accordingly, the Court concludes that the obligation owed by Mr. Battles to Mr. Fulcher pursuant to the Genesee County Circuit Court judgment is excepted from discharge pursuant to Section 523(a)(6). The calculation of that amount, as well as the enforcement of the judgment, is left with the Genesee County Circuit Court.

Counsel for the Plaintiff is directed to prepare an order consistent with this Opinion and the entry of order procedures of this Court.

**Signed on May 02, 2018**

/s/ Daniel S. Opperman
**Daniel S. Opperman**
**United States Bankruptcy Judge**